v. United Brotherhood of Carpenters and Joiners of America et al., oral argument, not to exceed 15 minutes for plaintiff, 15 minutes to be shared by defendant. Mr. Stephen M. for the appellant, you may proceed. Thank you. And good morning, Your Honors. I represent the appellant, Jonathan Barger, who was the plaintiff in the case below. I'd like to reserve three minutes of rebuttal time. Very well. May it please the court. Your Honors, I'd like to begin with a direct quotation from the speech that my client made that led to his being charged, tried, and convicted by his union. My client saw three of his union brothers, Art Galea, Kip Callenbeck, and Daniel Jason Hall, engaged in corrupt activity in the form of ghost payrolling or submitting fraudulent payroll records to a contractor that they were working for. This was directed, this activity was directed by the vice president of my client's local, Art Galea. Your Honor, the following is taken directly from the trial transcript of the union trial where my client was convicted for making the following statements. And what Mr. Barger said was the following. We have to do something with these three, referring to Galea and the others, because they are making our brotherhood look bad. Your Honors, that's at page 1813 of the record. Later, Mr. Barger said at the same trial, what he said to Mr. Meyer, his union brother, was, if that's the kind of people we want to have representing us in our union, then I probably don't want to be a part of it. Your Honor, that's at page 1828 of the record. This is what my client said to his union brother, Dave Meyer, about this corrupt activity that he saw his union engaged in. This is the speech, Your Honors, that got him charged, tried, and convicted by the defendants. His saying, in essence, our union should not be doing this. Our union should be better than this. Our union should not be engaged in this activity. Our union should be honest and ethical. Now, this speech, Your Honors, clearly relates to a matter of concern to the union membership as a whole. And my client, Your Honors, was entitled to engage in this speech, was entitled to make these statements to his union brothers about his union without fear of reprisal. Now, this court has held in the Knox County local case that the LMRDA provides for or requires a broad reading, a broad reading in quotes now, of the rights of union members when it comes to freedom of speech regarding matters of union concern. But it does not require a broad reading, Your Honors, for the law to encompass what my client was saying to Mr. Meyer that, as I say, got him charged, tried, and convicted by his own union. Now, I want to emphasize here that it is not, Your Honors, what my client said to Joe Lind of the contractor Dynegy that got him charged. And this is very clear, and it's not disputed in the record. What got my client charged, tried, and convicted were the statements that he made to Mr. Meyer, his union brother. At that point, Your Honors, my client was not trying to get a job with Dynegy. My client was not trying to advance any personal interest of his own. He was not speaking to someone who had any ability to affect his employability. He was not speaking to someone who had the ability to give him a job. Judge Bush, what was the context of the statements made to Mr. Meyer that you're referring to? Was this a phone call or a meeting or what? It was in a series of phone calls, Your Honors, after Mr. Meyer became aware of my client's conversation with Mr. Lind. So, in subsequent conversations with Mr. Meyer, where my client was asking about his paycheck and some other things, the subject of my client's statements to Mr. Lind came up. Okay, so these statements were not made in a public setting in front of other union brothers. It was a call between these two individuals, correct? Yes, that's correct, Your Honor. And I would like to expand on that because I don't believe that it matters for purposes of the LMRDA. I don't believe that it matters how many of his union brothers my client was speaking to because the LMRDA provides three separate protections within it. And those protections are, first of all, the right to meet and assemble. Secondly, the right to express any views, arguments, or opinions. And thirdly, the right to express his views at meetings on candidates or union business. So, the reason that it's important that those are three separate rights, Your Honors, is because only one of those three rights refers to the right to express yourself at union meetings. And the second of those rights that I just enumerated, set forth in Section 101 of the Act, provides that union members shall have the right to express any views, arguments, or opinions. That is irrespective of how many of your union brothers you're talking to, where you're expressing the opinions. And it doesn't have to be in a union meeting. You have a right to this freedom of speech as long as the matter concerns the union membership as a whole. And whether or not a union is going to be honest and ethical, or conversely, whether it's going to be corrupt and dishonest, is certainly a matter that touches on the interests of the membership as a whole. Everyone should be concerned with the ethics and the honesty of the organization that they're a member of. Let me ask you about a decision from our court, Local 9-11 versus United Food and Commercial Workers International Union. That case, I believe, sets forth a standard that the LMRDA protects only expressive activities that implicate union democracy. Does that standard apply to this case? And if so, how do these statements that you're referring to implicate union democracy? I don't believe that the LMRDA is limited to matters involving democracy in the sense that we normally use the word democracy. That is having to do with elections or candidates. That's to the extent that the case Your Honor cites purports to limit a union member's right to freedom of speech to cases involving elections or candidates or instances involving elections or candidates. I don't believe that's consistent with Supreme Court precedent. I don't believe that's consistent with other precedent. What particular Supreme Court precedent do you think it's not consistent with? I would cite the court to the 1989 case of United Sheep Metal Workers versus Lynn, in which the Supreme Court stated as follows that the purpose behind the LMRDA or the mindset behind the LMRDA was that, quote, democracy would be assured. Democracy within a union, that is, would be assured only where members are free to discuss union policies and criticize the leadership without fear of reprisal. Close quote. I would state, Your Honor, that it is clear that what Mr. Barger was doing by telling Mr. Meyer that the local vice president, Art Galea, and two other union brothers at Mr. Galea's direction, were engaging in corrupt activity that was looking bad on our union and that was making it into a union that he didn't want to be a part of. I would suggest that within the context of the LMRDA and consistent with the statements of the Supreme Court in Lynn and in other cases, that this certainly falls within the broad reading of the statute that this court has required. Again, emphasizing that my client was directing his ire in part at the vice president of his own local, which, as we know from other cases outside this circuit, particularly the Petramel case from the Second Circuit, where courts have held that any speech or any prosecution by a union of one of its members that includes an allegation of slander against a union leader is a per se violation of the LMRDA, a per se violation of the statute. If the LMRDA is to mean anything, your honors, it certainly has to mean that a union member has the right to criticize its leadership and to accuse its leadership of unethical or corrupt practices, and that's precisely what my client was doing when he was speaking to Mr. Meyer. One minute left. Thank you. Now, this case, your honors, is really a very simple one at bottom. It is about the right of a union member to say to his union brothers and sisters, I don't like what our union is doing here. We shouldn't be doing this. This isn't the kind of union I want to be a part of. This activity is making our union look bad. Your honors, if you can't say that without fear of reprisal, if you can't say that without fear of prosecution, then I respectfully submit that the LMRDA doesn't provide any meaningful protection. The LMRDA doesn't mean nothing. It doesn't mean anything. Can I ask, this is Judge Larson, how do we know that what your client was charged with and dismissed from the union, you claim that the statements were just those that he made to Mr. Meyer and not those that he made to an outsider. How do I know that that's true other than just taking your word for it? Because, your honor, that's what Dave Meyer himself said. Dave Meyer, your honor, was the person to whom these statements were made. And Mr. Meyer says, and I'll tell you this appears at page 1736 of the record, Mr. Meyer himself, your honor, said that it was not my client's statements to Mr. Lind that caused him to bring these charges. It was his subsequent statement to Mr. Meyer himself, his statements to Mr. Meyer himself, when he, in Mr. Meyer's words, wouldn't let it go. And he continued to press on this issue of the corrupt activity that he saw being engaged in. So that record is crystal clear, your honor. It was not my client's statements to Mr. Lind, it was rather my client's statements to Mr. Meyer, his own union brother, when he was not looking for a job, when he was not looking for any personal advantage. It was those statements that got him charged, tried, and convicted. Okay. Any other questions of counsel? Okay. Mr. Hamm, thank you. You will have time for rebuttal. I believe your time has expired. So we'll now hear from Mr. Berkowitz. Good morning, your honors. My name is Paul Berkowitz. I'd like to welcome Paul T. Berkowitz and Associates, and we represent the Indiana, Kentucky, Ohio Regional Council of Carpenters and Carpenters Local 2. I will take 13 minutes to address the court, and Mr. Quinn, representing the International Union, the UBC, will have two minutes.  I want to say that nothing in appellant's brief, either his arguments previously raised before the court, or the new arguments improperly presented for the first time to this court, or even the new factual allegations that he presented to you just now, which do not appear in either of his briefs, undermine the propriety of the district court's decision that Farger's speech does not implicate matters of union concern. I will quote from the district court's opinion, based on deposition testimony, not on the transcript, which was never presented for argument here, but rather on deposition testimony. Specifically, the district court's order found that on October 27th, Farger called Joe Lind, Dynergy's maintenance manager at Zimmer Station, who was responsible for certain outside vendors, including Solid Platform, which was the employer of these three individuals, and also of Mr. Farger. During that call, Farger asked Lind for a job with Dynergy, and Lind responded that they were not taking applications. Farger responded that if he could pay his own way, he would like to have a job, and Lind asked, how is that? Farger said that Solid Platforms are stealing money from you, by which he meant falsifying hours. Now, I underline Farger's statement that Solid Platforms is stealing money from you, not Local 2, not the unions, but simply Solid Platforms. Continuing in the district court's decision, Farger brought up his allegations of hours falsification as a way to save Dynergy enough money to pay for his employment. On that same day, Farger called, that he spoke to Lind, he also called to Local 2 member, but more importantly, IKRCC business representative, Dave Meyer. He told Meyer that he had spoken to Lind, repeated his conversation with the Dynergy official, and Meyer responded that you're going to hurt the union members, you're going to hurt Solid Platform, and Barger's position was he didn't care, he wanted to get those guys. He wanted to get those guys. So, Mr. Im's presentation is not what was presented in his brief. Continuing... Counsel, this is Judge Larson. Does motive matter? So, for example, what if Mr. Barger had made a statement at a meeting, at a union meeting, and basically these same statements, like our union shouldn't be corrupt, or whatever sort of statement that he wants to make. And then we discover that his sole purpose, he didn't really care about ghost billing, his sole purpose was that he had a personal vendetta against these three individuals. Is it a motive test that we're worried about, or is it a content of the speech test? It seems to come back to motive a lot, and I'm wondering whether it matters. Well, I think, if I can, it really deals with context. If he would have brought these matters up at a union meeting, then the LMRDA would apply. But he didn't bring it up at a union meeting. He talked to a third party. He talked to Dynergy's maintenance manager. He spoke to the ICARC's business representative. He did not speak to the membership as a whole. And we can sum up that perhaps he did that because he was trying to motivate Meyer to get him a job with Dynergy, or get his job back with Solid Platforms. I know that's not in the record, but the fact is he did not bring it up to the membership. He only brought it up to the outside third party, and he also brought it up with the union's business representative, period. You can go any further than that. But your position can't be that he had to make the statement during a union meeting, because that's its own category under the statute, right? Right, but speaking, but speech to a third person outside of the union is not union speech. The LMRDA governs, the purpose of the LMRDA is to protect union members to speak and to assemble. His conversation with a third party employer representative is not union speech. The complaint that Solid Platforms was stealing, which is exactly his words in his deposition, is not the union. He didn't say the union was stealing. He didn't say that the union vice president was directing this. His speech, and given in his deposition, which appears at page six of our brief, is that he wanted a job. Period. He wanted a job. And underlining all of this is when you look at the complaint, the complaint does not seek any relief for the organization. It's not seeking any relief for the members of the organization. It was simply for his attempt to get back wages and damages for psychological or medical or whatever damages that he never incurred. So by definition, this complaint is a singular complaint. You cannot change a complaint that I want my lost wages, and you cannot convert it now at this level into saying, well, I was really concerned about my union brethren. He didn't say that in his complaint. It was simply a solo, individual case. So what about the statement that he made to Myers? You're talking about the statement he made to Linn, but what about the statement that he makes to Myers? Well, that's also in the court's findings. And he just, Archer also told Myers that he spoke to Linn and told him that Calleback Hall and Galea were ghost payrolling. That's synergy. Synergy. There's no mention about the union's involvement. There's no mention of a union vice president. Archer also told Myers that he spoke to Linn, the Dynagy representative, and told him that Calleback Hall and Galea, all admittedly local to members and therefore members of the council, were ghost payrolling at Dynagy. Period. That's it. Now, as I said, it wouldn't be a different matter, perhaps, if he raised it in the union context. But he didn't. It was simply made to a Dynagy representative and to the union business representative. Now, the LMRDA section 101A2 is not the same as the First Amendment. It is limited to the union membership. It deals with union government. It deals with the right to meet, assemble, express views, elections, business, property before the meeting. It doesn't say that my speech to a third party who's not a member is covered under this law. Now, the timing of this also has to be considered. He was laid off on October 27th by SPI. Solid platform. It was that same day that he called the manager and had the verbal exchange that I previously mentioned in the court. If he was really concerned about it being some sort of union matter, he could have raised it before. But he brought it up solely and expressly because he was looking for a job because he had just lost the job. And apparently he was mad at the three supervisors who apparently he decided to lay him off. And he was going to get even with them. He could have talked to union members, but he didn't. He could have talked to the union members at any time. Now, I know Mr. In has said that, well, he didn't have time to talk. Well, he himself was involved in this so-called ghost payroll link, so he could have brought it up at any time. But he waited until he lost his job and he needed a new job. Period. Now, this is an idiosyncratic case. He's only seeking relief for himself, as he said to Joe Lynn, the Dynegy representative. And, as he said in his complaint. Now, this is not a case like Max or Schuman from the circuit, which deal with union publications. And those cases dealt with an illegal prohibition against members expressing themselves in a union publication. The High Law 8th Circuit case, as well as the Trail case cited in our brief, deal with individual cases where they're only interested in their own particular wants. And the fact that they did not express it to anybody else, as the Fourth Circuit said in Trail, adds to the impression that the member was not speaking on a matter of concern to her union's general membership. But the Petromali case from the Second Circuit, which Mr. In identified, is speaking at a union meeting. He's speaking at a union meeting. Now, there is a case cited in the United Brotherhood's case, brief at page 16, the Helmer v. Brody case, which says, more importantly, plaintiff's communications with authority about alleged union corruption are not the type of expression protected by the LMRDA. The free speech provisions of that act are designed to protect speech in the context of a union democratic process. I.e., political speech primarily addressed to other union members rather than free speech at large. That's why the First Amendment and the LMRDA are different. Mr. speaking to the Dinergy superintendent was speech at large. It does not fall within the meaning of the act. Finally... This is just Larson again. I'm just trying to figure out the limiting position of your position. So, isn't your position that speech to a third party can never be protected? I mean, what if he had gone to the state attorney general? Or, you know, what if there were actual corruption? And, of course, we don't know the truth of any of this. But, like, what if there were some sort of actual corruption going on and he had gone to the state attorney general? Well, there were. An outsider. Is it an inside-outside kind of position? Or, is it the content of the speech? Or, is it a sliding scale? Well, I think it is a sliding scale. And, obviously, if he wants the police, it would be something else. But, tellingly, he didn't. He just went to the owner of the property and asked for a job. Now, as we state in our second and third arguments... One minute left. Number one is he's raising issues. Mr. In is raising issues there which were never presented to the court, the district court below, and, therefore, should not be addressed. So, and number two is that in support of his brief, our issue three is he raises issues or makes factual statements. Mr. In makes factual statements that were not found by the court. He says on ten separate occasions that Dinergy is a public utility for some reason. He states that the parties agreed that the money was taken at the direction of the local two vice presidents. That was never agreed to. Nothing was agreed to like that. It never even came up. And, finally, he says that he proved the following. That there was crime fraud. That he was charged with slander. That his appeals were stolen by the union. Untrue. Nothing in the record supports those statements. I see my time is up. Thank you, Mr. Berkowitz. Mr. Quinn. May it please the court, Brian Quinn for the United Brotherhood of Carpenters and Joiners of America, which I will refer to as the UBC. As Mr. Berkowitz explained, Mr. Barger's speech is not protected under the LMRDA. Even if his speech was protected, Mr. Barger still has no plausible claim against the UBC. The district court specifically found that the UBC was not involved in the processing of the charges that gave rise to the free speech claim. Thus, to prevail, Mr. Barger must show a genuine issue of material fact to either an agency relationship existed between the UBC and other defendants, or that the UBC ratified other defendants' misconduct in order to violate the LMRDA or to conspire to violate the LMRDA. Mr. Barger cannot do either. First, there is no agency relationship between the UBC and the other defendants, which Barger admits and does not dispute. Second, the UBC did not ratify any alleged misconduct of the other defendants or engage in a conspiracy of the council. For example, the UBC processed Mr. Barger's appeal in accordance with the UBC Constitution and did not delay in its consideration. The declarations of Appeals Committee Chairman Jason Engels and of the UBC's Mr. McVeigh are unrebutted. Also, in its order partially granting UBC's motion to dismiss, the district court, even taking Mr. Barger's complaint allegations as true, rejected Mr. Barger's ratification theory with respect to the processing and granting of Barger's appeal. The case law cited by the UBC in its briefs also supports the court's finding. As further evidence of neither ratification or a conspiracy, Mr. Barger admits and does not dispute that the UBC granted Mr. Barger's appeal on grounds raised by Barger. And because of the UBC's action, guilty verdicts were vacated, penalties which never went into effect, and the charges against Barger were dismissed. Finally, under GIFRI, because no discipline was imposed, there can be no LMRDA claim. For all these reasons, summary judgment for the UBC and all defendants should be affirmed. Thank you. Thank you, Mr. Quinn. Mr. M, do you have a rebuttal? I do, Your Honors. Thank you. I have to reemphasize the fact that Mr. Meyer himself, the person who brought the charges, Your Honor, and I understand why the defendants want to run away from this and get the court to ignore it, but Mr. Meyer himself made quite clear, and this is not a new argument. It was in the district court decision, it was in the briefing below, and it's in the briefing that's before the court. It is not the statements that were made to Mr. Lind that got my client charged, tried, and convicted. It was the statements he made to Mr. Meyer himself, a union brother, which had nothing whatsoever to do, nothing whatsoever to do with my client trying to achieve new employment or obtain new employment. And I will reiterate, this is very crystal clear in the record at page 1736. One of Your Honors asked the very important question of whether or not motive matters, and the fact of the matter is that my colleague sidestepped this question in his response. The Sixth Circuit is very clear in addressing free speech cases under the First Amendment, which are often turned to by courts when analyzing the LMRDA because the LMRDA is modeled after First Amendment principles. This court said in the Banks case and in the Bonnell v. Lorenzo case that motive, if it matters at all, matters very little. It is primarily a content-based inquiry. Look, we all have different motives for saying what we say. Many times we're acting out of personal motives, but if I'm engaging in protected speech, if I'm exercising a right that's guaranteed to me as a union member or as a citizen, it doesn't matter whether I have a self-interested motive. It is the content of my speech which is important, and this very circuit has made that entirely clear. The answer to Your Honors' question is no, motive does not matter, nor does it matter that he made these statements to an individual union member or even to a third party, as opposed to the union membership as a whole. There is absolutely no requirement, no requirement in the law that you have to make statements at a union meeting or to the union membership as a whole in order for it to be protected. I would remind the court of another fact that's in the record, and that is my client made these similar statements two years previously to another union member, Kip Callenbeck. And I'll also remind the court that he was charged immediately after he made these statements to Mr. Meyer. It's also important to recognize that what my client said to Mr. Meyer, insofar as if this is the kind of people we're going to have in our union, I don't want to be a part of it, Mr. Meyer admits, Your Honor, that my client said that. That was the speech that got him charged, tried, and convicted, and that's at page 1726 of the record. That's admitted to Mr. Meyer. That was the statement. Thank you, Your Honors, and I appreciate your time this afternoon. Thank you, Mr. M. And thank you to all counsel. The case will be submitted.